UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| JOHN CRONKHITE, M.D., | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-1577-SEB-JMS |
| | ) | |
| UNITY PHYSICIAN GROUP, P.C., | ) | |
| Defendant. | ) | |

**ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause comes before the Court on the Motion for Summary Judgment [Docket No. 34] filed by Defendant, Unity Physician Group, P.C. ("Unity"), pursuant to Federal Rule of Civil Procedure 56.  Plaintiff, John Cronkhite, M.D. ("Dr. Cronkhite"), alleges that Unity violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, by coercing Dr. Cronkhite to resign from his position as an emergency physician due to his age and/or disability.  In its Motion for Summary Judgment, Unity asserts that it is entitled to judgment as a matter of law because Cronkhite was not its "employee" and thus is not a protected individual under either the ADEA or the ADA.  For the reasons detailed in this entry, we <u>GRANT</u> Defendant's Motion for Summary Judgment.[1]

---

[1] Defendant's Second Motion for Summary Judgment [Docket No. 40] is <u>DENIED</u> as moot.

### *Factual Background*

Unity is a provider of emergency medicine services.  It provides such services to hospitals on a contract basis, and also independently owns and operates Immediate Care Centers ("ICCs") throughout Indiana.  Def.'s Br. at 1.  Unity is the current corporate successor (after a number of corporate mergers and reorganizations) to a corporation initially formed in the 1970s.

Dr. Cronhkite was born on October 5, 1947.  He was affiliated with Unity and its predecessor corporations from July 1980 to August 2004.  Compl. ¶ 10.  Throughout this period, Dr. Cronhkite served as an emergency physician, treating patients in the Bloomington (Indiana) Hospital emergency room and in ICCs.

*Unity's Corporate History*

In 1980, Dr. Cronhkite joined Bloomington Emergency Department Services, Inc. ("BEDS") as a physician providing emergency patient care.  In 1981 or 1982, Dr. Cronhkite purchased stock shares in BEDS and became an "original shareholder" in the company.  Cronhkite Dep. at 13, lns. 14-22; p. 52 ln. 21 – p. 53 ln. 2.

Over the next several years, the corporate entity with which Dr. Cronhkite was involved underwent several mergers and reorganizations.  In 1984, BEDS merged with Emergency Care Physicians, Inc. – Chapel Hill to form Emergency Care Physicians, Inc. ("ECP, Inc."), which subsequently changed its name to Emergency Care Physicians, A Professional Corporation ("ECP, APC").  In 1994, the ECP, APC shareholders again changed the corporate name to ECP Healthcare, P.C. ("ECP Healthcare").  In 1996, ECP

Healthcare merged with two other physician groups to form Unity.  Def.'s Br. at 4-5.

Dr. Cronkhite was a shareholder in both ECP, APC and ECP Healthcare.  He was also a member of the Board of Directors of Unity's various predecessor organizations from January 15, 1982 to December 31, 1995, and a Vice President from January 2, 1984 to December 31, 1995.  Def.'s Ex. H; Def.'s Br. at 5.


*Dr. Cronkhite's Duties and Responsibilities as a Shareholder and Director*

Dr. Cronkhite's general duties as a shareholder and director of the various corporate entities included voting on and approving business initiatives, capital expenditures, policies, procedures, and new business ventures.  He also participated in the process of electing officers and admitting new shareholders, and in approving shareholder bonuses and salary changes.  Def.'s Br. at 6.  Dr. Cronkhite's duties as a Vice President were the same as those listed above, with the additional responsibility of replacing the Board President should the President become incapacitated.  Id.

From 1983 to the mid-1990s, Dr. Cronkhite served as Medical Director of an ICC in Chapel Hill.  He bore responsibility for the overall management of the facility, including input with respect to staff issues, equipment, and reporting to the Board on the day-to-day operations of the facility.  Id. at 9.

In addition, Dr. Cronkhite participated in decision-making processes regarding corporate mergers, reorganizations, and acquisitions while he was a shareholder in Unity and its predecessor corporations.  For example, Dr. Cronkhite voted in favor of an agreement to merge ECP, APC with another company in 1992.  In 1993 and 1994, he

voted to reject another entity's offers to purchase ECP, APC.  Dr. Cronkhite also

(together with his fellow shareholder/directors at ECP Healthcare) agreed to recommend

to shareholders the merger of ECP Healthcare with two other physician groups, IMA and

Integ, to form Unity in 1995.  Def.'s Br. at 9-10.

From 1996 to 1998, Unity underwent a corporate reorganization in which IMA and

Integ withdrew from Unity.  Dr. Cronkhite voted as a shareholder on this reorganization.

Cronkhite Dep. at 38 lns. 23-25.  During this time, Dr. Cronkhite owned over three

million shares of Unity stock – approximately a 12% ownership interest in outstanding

stock shares.  See Def.'s Ex. E.  After the corporate reorganization of Unity, Dr.

Cronkhite continued to vote as a shareholder.  In 2003, Dr. Cronkhite was nominated to

become a member of Unity's Board of Directors; he voted for himself, but ultimately he

was not elected to the board.  Cronkite Dep. at 20 ln. 25 – 21 ln. 9.

Dr. Cronkhite also participated in securing financing for Unity from lending

institutions.  In 1998 and 2004, he signed personal guaranties obligating him to personally

pay $2.5 million and $700,000, respectively, to a lending institution if Unity were to

default on its loans.  Def.'s Br. at 12.  For both of these loans, only major shareholders

were asked to sign personal guaranties; minor shareholders and non-shareholder

physicians were not asked to sign such guaranties.[2]  Bishop Dep. at 129 lns. 6-21.

Dr. Cronkhite also shared in Unity's financial profits in the form of discretionary

---

[2] For the 1998 personal guaranty, "major shareholders" were those who owned
approximately 3.6 million shares of Unity stock.  Bishop Dep. at 129 lns. 6-11.  Unity states that
there were seven major shareholders of Unity.  Def.'s Br. at 22.

bonuses as a Unity shareholder.  These bonuses were determined by Unity's Board of

Directors and were primarily based on performance, length of service, and excess cash

available at year's end.  Dr. Cronkhite received such bonuses eighteen times between

1980 and 2003.  Between 1999 and 2003, the bonuses ranged in amount between

$150,000 and $334,750.  Def.'s Ex. N.


*Dr. Cronkhite's Duties and Responsibilities as a Physician*

In Dr. Cronkhite's role as a Unity physician, he provided professional medical

services to patients in emergency departments and ICCs.  The "Professional Judgment"

clause of Dr. Cronkhite's contract with Unity (the "Physician Employment Agreement")

provided that:

> Physician [Dr. Cronkhite], as a licensed physician, shall assume full
> responsibility for the care of Unity's patients served by Physician and Unity
> shall not direct, supervise, or control Physician in the professional care of any
> individual patient; provided, however, that this paragraph shall not prevent
> Unity from promulgating general rules applicable to Physician governing the
> provision of medical care to patients or from relieving Physician of the care of
> an individual patient when, in the opinion of Unity, Physician is not observing
> such general rules.[3]

In his deposition, Dr. Cronkhite could not recall any instances in which Unity

failed to honor the Professional Judgment clause of his contract.  Cronkhite Dep. at 129

lns. 1-13.  He further testified that, though he was supervised, he had the general control

of his practice and that, ultimately, his judgment as a physician was his own regarding

---

[3] Def.'s Ex. P. ¶ 2.4.

each patient he encountered.  Cronkhite Dep. at 45 ln. 19 – 46 ln. 12.

The Physician Employment Agreement between Cronkhite and Unity was an agreement with no set term, and specified that it could be terminated without cause by Unity only by a vote of seventy-five percent of Unity's Board of Directors.  Def.'s Ex. P ¶ 5.3.  In contrast, the employment agreements Unity used for non-shareholder physicians were one-year term contracts which contained no such 75% provision, stating instead that the contract could be terminated by either the corporation or employee with ninety days' notice.  Def.'s Ex. Q.


*Dr. Cronkhite's Relationship with Dr. Slaughter*

Unity conducted annual peer reviews among its physicians, which were primarily conducted by Dr. Owen Slaughter ("Dr. Slaughter"), another major shareholder of Unity and the medical director of the Bloomington Hospital Emergency Department.  Dr. Slaughter conducted peer reviews of Dr. Cronkhite and other Unity board members who worked within the emergency department of Bloomington Hospital.  Dr. Cronkhite described Dr. Slaughter's role as a "liaison with the board of Unity" and as "supervisory," and stated that, "[i]f the board had some specific concerns with [Dr. Cronkhite], [Dr. Slaughter] would be the messenger to communicate on an initial level."  Cronkhite Dep. at 114 lns. 4-11.  Unity maintains that to the extent Dr. Slaughter worked with Dr. Cronkhite regarding performance issues, he did so in his capacity as medical director of the Bloomington Hospital Emergency Hospital.  Bishop Dep. at 105 ln. 19 – 108 ln. 7. Dr. Slaughter also investigated complaints against emergency department physicians.  Id.

at 69 lns. 9-25.  Dr. Michael Bishop, CEO of Unity, testified that medical directors were responsible in urgent care facilities "for taking care of some physician issues" and that in the emergency room they had responsibilities "from the hospital side as well as from [Unity's] group side."  Id. at 28 lns. 5-20.  Dr. Cronkhite also testified that Dr. Slaughter gave input to the scheduling of physicians, led and organized monthly departmental meetings, and served as a liaison to nurses and other physician groups.  Cronkhite Dep. at 110 ln. 14 – 111 ln. 25.

Dr. Cronkhite testified that during 1989 and 1990, he experienced some performance problems due to "a real difficult time in [his] life" and that Dr. Slaughter served as a liaison between him and the Board at that time, monitoring complaints and suggestions from fellow physicians and meeting with Dr. Cronkhite approximately every other month to discuss his progress.  Cronkhite Dep. at 114 ln. 12 – 155 ln. 3.  On another occasion in January 2000, Dr. Slaughter informed Dr. Cronkhite by letter that if performance problems persisted, the Board of Directors had made "a firm recommendation" that he not be allowed to continue working in the Bloomington Hospital Emergency Department.  Pl.'s Ex. 15.

*Dr. Cronkhite's Resignation from Unity and Procedural History*

On June 7, 2004, Dr. Cronkhite submitted his resignation to the Unity Board of Directors, effective August 31, 2004.  Dr. Cronkhite maintains that his resignation was

coerced by Unity due to his age and (perceived) disability.[4]  Unity contends that it had

requested Dr. Cronkhite's resignation after an increasing number of complaints from

doctors and other staff members regarding the reduced quality of his patient care.  On

November 29, 2004, Dr. Cronkhite filed a Charge of Discrimination with the EEOC, and

on October 19, 2005, he filed this action, alleging that Unity constructively discharged

him in violation of the ADA and ADEA.  Here, Unity seeks summary judgment on both

claims, on the basis that Dr. Cronkhite was not its "employee" and thus is not entitled to

protection under the ADA or ADEA.[5]

### *Legal Analysis*

**I.    *Standard of Review***

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material

fact exist, the court construes all facts in a light most favorable to the non-moving party

---

[4] Dr. Cronkhite was fifty-six years old at the time of his resignation, and suffered from a heart condition.

[5] In its Second Motion for Summary Judgment, Unity disputes the merits of Dr. Cronkhite's allegations of discrimination.  As previously noted, this motion is denied as moot.

and draws all reasonable inferences in favor of the non-moving party.  See id. at 255.

However, neither the "mere existence of some alleged factual dispute between the

parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the

material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of

Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears

the burden of proof at trial may discharge its burden by showing an absence of evidence

to support the non-moving party's case.  Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle

for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th

Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of

the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the

party opposing the motion, summary judgment is inappropriate.  See Shields Enterprises,

Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of

Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be

unable to satisfy the legal requirements necessary to establish his or her case, summary

judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v.

AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

## II.     Whether Dr. Cronkhite was Unity's Employee

The ADA and ADEA each define "employee" as "an individual employed by [an] employer."  42 U.S.C. § 12111(4); 29 U.S.C. § 630(f).  This nominal definition, however, does not provide helpful guidance for determining whether an individual such as Dr. Cronkhite is covered by the statutes.  See Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318, 322-3 (1992) (stating that ERISA's similar definition of 'employee' is "completely circular and explains nothing").

In Clackamas Gastroenterology Associates v. Wells, 538 U.S. 440 (2003), the Supreme Court applied common-law agency doctrine to interpret whether an individual (also a physician-shareholder) qualified as an "employee" under the ADA.[6]  Specifically, it determined that "the common law's definition of the master-servant relationship does provide helpful guidance," noting that "[a]t common law the relevant factors defining the master-servant relationship focus on the master's control over the servant."  Id. at 448.  The Court approved the EEOC's formulation of a test consisting of six factors relevant to the inquiry, no one of which alone is dispositive.  Those factors are as follows:

---

[6] In Smith v. Castaways Family Diner, 453 F.3d 971, 983 (7th Cir. 2006), the Seventh Circuit clarified that the Clackamas analysis is also applicable to the ADEA context.

> Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work;
>
> Whether and, if so, to what extent the organization supervises the individual's work;
>
> Whether the individual reports to someone higher in the organization;
>
> Whether, and if so, to what extent the individual is able to influence the organization;
>
> Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts; and
>
> Whether the individual shares in the profits, losses, and liabilities of the organization.

Id. at 450-51.  Courts should consider these six factors in determining "whether the individual acts independently and participates in managing the organization, or whether the individual is subject to the organization's control."  Id. at 449.  In Castaways, the Seventh Circuit clarified that application of the Clackamas test "is not confined to shareholder-directors, but properly may be applied to partners, officers, members of boards of directors, and major shareholders."  453 F.3d at 977.

### A.    Relevant Timeframe for Analysis

Before we proceed with our application of the Clackamas factors, we must determine the relevant timeframe for our inquiry.  The parties dispute whether we should apply our Clackamas analysis to Dr. Cronkhite's status within Unity solely at the time of the severance of his employment relationship, or to his status over the course of his twenty-four-year tenure within Unity (and its predecessor organizations).  Dr. Cronkhite

11

maintains that we should consider only his status at the time he resigned from Unity, and that all facts about his employment history prior to that point are immaterial.  He asserts that his degree of control within Unity was quite limited after 1996, when he left the Board of Directors and served merely as a physician-shareholder.  Pl.'s Resp. at 2-3.  Unity rejoins that Dr. Cronkhite's history within the company is directly relevant, citing Seventh Circuit decisions which have taken an individual's longer-term employment history into consideration when applying <u>Clackamas</u>.  <u>See, e.g.</u>, <u>Schmidt v. Ottawa Medical Center, P.C.</u>, 322 F.3d 461 (7th Cir. 2003); <u>Solon v. Kaplan</u>, 398 F.3d 629 (7th Cir. 2005).

We agree with Unity that Dr. Cronkhite's history within Unity and its predecessor organizations is relevant to our determination of whether he was Unity's employee at the time the employment relationship was terminated.  In <u>Solon</u>, the Seventh Circuit discussed and considered the ten-year tenure of a former managing partner of a law firm in determining (under <u>Clackamas</u>) that he was not an employee of the firm for purposes of Title VII.  398 F.3d at 631-33.  Similarly, in <u>Schmidt</u>, the Court considered a physician-shareholder's relationship with a medical center and cited examples of indicia of control by the physician-shareholder over the course of their thirty-four-year relationship.  <u>See, e.g.</u>, 322 F.3d at 467 (stating that Dr. Schmidt had "*in the past* and now also enjoy[ed] a voice in all matters put before the board" and that "[*t*]*hroughout his relationship* with OMC and continuing to the present day, Dr. Schmidt thus has had ample opportunity to share in the management and control of OMC" (emphasis added)).

12

Of course, though relevant, the weight to be given to facts about Dr. Cronkhite's degree of control within the organization twenty-four years ago is very likely less than that to be accorded to facts about the relationship more recently, which temporal dimension will be included in our analysis.

     *B.*    *Application of <u>Clackamas</u> Factors*

Now, proceeding to apply the six-factor <u>Clackamas</u> test to Dr. Cronkhite's relationship with Unity, we consider each factor in turn.

     1.    <u>Whether Unity Could Hire or Fire Dr. Cronkhite or Set the Rules and Regulations of His Work</u>

Unity maintains that it could not fire Dr. Cronkhite in the usual sense because of the provision of the Physician Employment Agreement which stated that the agreement could be terminated without cause by Unity only by a vote of seventy-five percent of Unity's Board of Directors.  Unity states that there were six members of its board,[7] so, effectively, five of the six directors would have had to agree to terminate Dr. Cronkhite's contract.  Def.'s Br. at 22.  This level of job security was not shared by non-shareholder physicians.  Unity also argues that it did not set the rules and regulations of Dr. Cronkhite's work.  It maintains that, through Dr. Cronkhite's status as a shareholder (and, previously, director) of Unity, he helped establish the rules and regulations of Unity's

---

[7] Though no citations have been provided to substantiate this number in the record, Dr. Cronkhite does not dispute that there are six directors on Unity's board, so we assume this to be correct.

operations.  Id. at 23.

Dr. Cronkhite rejoins that, though he did hold "an ostensible measure of protection not enjoyed by an at-will employee" (Pl.'s Resp. at 14), his contract allowed Unity to immediately terminate the agreement for various enumerated reasons (fraud, dishonesty, etc.) at any time.  Further, Unity's employment handbook, which Dr. Cronkhite received, stated that "either [he] or Unity Physician Group can terminate the relationship at will, with or without cause, at any time."  Id.  Also, Dr. Slaughter's discussions with Dr. Cronkhite made clear that if his performance problems continued, he would be asked to leave Unity.  Therefore, Dr. Cronkhite maintains that he was essentially an at-will employee and that "Unity made it clear . . . that any protections he may have had due to his shareholder status meant little because the Board of Directors not only had the ability, but the stated will and required majority, to terminate his employment."  Id. at 14-15.  Dr. Cronkhite also notes that he received a W-2 tax form from Unity and typical employee benefits, such as insurance and 401(k) contributions.

It appears to us that, though Unity could ultimately have fired Dr. Cronkhite, it would have faced much steeper hurdles in doing so than applied in terminating a non-shareholder physician.  The seventy-five percent provision is comparable to the termination provision at issue in Solon, which required a two-thirds vote of the general partners of a law firm (effectively a unanimous vote, given the number of partners) in order to involuntarily terminate Solon's relationship with the firm.  The Seventh Circuit, in ruling that Solon was not an employee of the firm for Title VII purposes, held that this

benefit, along with others, "distinguished [Solon] from the firm's special partners and associates."  398 F.3d at 633.  <u>See also</u> <u>Pearl v. Monarch Life Ins. Co.</u>, 289 F.Supp.2d 324, 328 (E.D.N.Y. 2003) (holding that a shareholder-physician was not an employee under a <u>Clackamas</u> analysis, in part because he "could be neither hired nor fired *in the usual sense*" (emphasis added)).  This distinguishing element is present in Dr. Cronkhite's case, as well.

It is clear from the face of the employment agreement that Dr. Cronkhite was not an at-will employee, but instead benefitted from heightened job security that non-shareholder physicians did not.  Though the employment handbook does state that either party could terminate the employment relationship, with or without cause, at any time, there has been no indication that that document was intended to modify (or did modify) the terms of the Physician Employment Agreement.[8]

Additionally, the fact that Dr. Cronkhite received employment benefits and was issued a W-2 tax form does not demonstrate that he was an employee.  <u>See, e.g.</u>, <u>Baker v. Berger</u>, 2001 WL 1028394 (N.D. Ill. 2001) at *4 ("the fact that [an individual] was paid a salary, had deductions withheld from his pay, engaged in day to day operations, earned employment benefits, and was included in tax wage sheets" did not preclude the Court's decision that he was an employer for purposes of Title VII).

Because it is clear that Dr. Cronkhite was treated more favorably than non-

---

[8] Unity points out that the Employment Agreement specifically provided that it could only be modified by a written document signed by the parties.  Def.'s Ex. P ¶ 6.2.  It characterizes the language in the employee handbook as "boilerplate."  Def.'s Reply at 6 n. 6.

shareholder physicians with respect to his job security, and because Dr. Cronkhite has not articulated arguments rebutting Unity's contention that it did not set the rules and regulations governing Dr. Cronkhite's work, we find that the first <u>Clackamas</u> factor weighs in favor of a determination that he was not Unity's employee.

<u>2.</u>    <u>Whether Unity Supervised Dr. Cronkhite's Work</u> and
<u>3.</u>    <u>Whether Dr. Cronkhite Reported to Someone Higher within Unity</u>

Because the second and third factors of the <u>Clackamas</u> analysis are substantially similar, we examine them together.  Unity maintains that it did not supervise Dr. Cronkhite's work, as evidenced by the professional judgment clause of his contract, which Dr. Cronkhite testified was honored; his medical judgment was his own.  Further, it states that Dr. Cronkhite was not directly supervised by Dr. Slaughter or anyone else. Dr. Cronkhite and Dr. Slaughter were both major shareholders who stood on equal footing within Unity; the fact that Dr. Slaughter conducted peer reviews of Dr. Cronkhite and other shareholder-physicians and Board members, and the fact that he took on an organizational role as medical director of the Emergency Department, did not constitute supervisory acts.  Def.'s Br. at 23-24.

Dr. Cronkhite maintains that Unity *did* supervise him, citing the portion of the professional judgment clause which provides that Unity could "promulgat[e] general rules . . . governing the provision of medical care to patients or of relieving Physician of the care of an individual patient when . . . Physician is not observing such general rules." Def.'s Ex. P ¶ 2.4.  Dr. Cronkhite contends that such language evidences the fact that he

*was* supervised by Unity.  Further, he maintains that Dr. Slaughter acted as his supervisor and that he reported to Dr. Slaughter, noting that Dr. Slaughter, as medical director, was responsible for addressing physician issues and discipline, that he fielded complaints about physicians, had input on bonus amounts for physicians, completed a yearly evaluation process with physicians, and performed other organizational duties.  Dr. Cronkhite also points out that Dr. Slaughter wrote him letters and communicated with him about conduct problems and his employment status within Unity, including a November 2000 letter recommending his transfer to a non-emergency department.  Pl.'s Resp. at 15-17.

We find that these two factors also weigh in favor of Unity's assertion that Dr. Cronkhite was not an employee.  The professional judgment clause makes explicit that, aside from general promulgations of policy, Dr. Cronkhite bore "full responsibility" for his own patient care and Unity would not "direct, supervise, or control" such care. Unity's ability to set such general rules does not amount to "supervision" under the second Clackamas factor – the explicit reservation of control to Dr. Cronkhite in his contract is far more telling.  See Clackamas, 538 U.S. at 448 ("[T]he common-law element of control is the principal guidepost that should be followed[.]").

As Unity points out, the professional judgment clause is similar to a contractual provision at issue in Schmidt.  In that case, Dr. Schmidt was contractually obligated to "perform such duties and occupy such positions and offices as the Board of Directors of the Corporation may from time to time determine, including . . . the treatment and

17

diagnosis of those patients assigned to him by the Corporation."  <u>Schmidt v. Ottawa</u>
<u>Medical Center, P.C.</u>, 155 F.Supp.2d 919, 920 (N.D. Ill. 2001).  Nonetheless, the Seventh
Circuit stated, in holding that Dr. Schmidt was not an employee, that "while Dr. Schmidt
may not possess sole authority over the conditions of his employment . . . , he does
exercise significant control," noting that Dr. Schmidt's "employment agreement vest[ed]
in him absolute authority for the treatment of his patients once assigned to him."  322
F.3d at 467.

Further, it does not appear to us that Dr. Slaughter was "someone higher in the
organization" to whom Dr. Cronkhite "reported."  It is clear from the record that Dr.
Slaughter, as medical director of the Emergency Department, did perform certain
organizational and liaison-type duties, and conducted peer reviews of Dr. Cronkhite and
other shareholder physicians who worked within the Department.  However, these actions
do not warrant a conclusion that Dr. Slaughter was Dr. Cronkhite's "boss" or that he was
positioned more highly within the organization than Dr. Cronkhite.  As Unity points out,
Dr. Slaughter conducted peer reviews of several Unity Board members who worked in the
Department; it does not follow (and no evidence has been adduced to suggest) that
Unity's Board members all reported to Dr. Slaughter.  Dr. Cronkhite and Dr. Slaughter
were both major shareholders of Unity; Dr. Slaughter's duties as the hospital's medical
director required him to communicate messages to Dr. Cronkhite and otherwise liaise
with him, but that does not make him Dr. Cronkhite's supervisor.  Thus, the second and
third <u>Clackamas</u> factors also support the conclusion that Dr. Cronkhite was not an

employee of Unity.

    4.    <u>Whether Dr. Cronkhite was Able to Influence Unity</u>

Unity maintains that Dr. Cronkhite influenced Unity significantly, serving as an original shareholder, major shareholder, Director, and Vice President of Unity and/or its predecessor organizations (as well as Medical Director of the Chapel Hill ICC) at various times over the course of his twenty-four-year tenure with the group. During these years, he voted on numerous key business issues, including the admission of new shareholders, corporate mergers and reorganizations, capital expenditures, business plans, and salary changes. He also helped Unity secure financing by personally guaranteeing its loans, and voted his stock shares – over three million, or 12% of outstanding shares – for candidates for the Board of Directors. Unity maintains that Dr. Cronkhite's influence is further evidenced by his own nomination to become a member of the Board in 2003. Def.'s Br. at 24-25.

Dr. Cronkhite responds that his ability to influence Unity was limited, at best. He describes Unity's management structure as "centralized" and describes in detail the amount of control and influence Dr. Bishop, Unity's President and CEO, has over the company. Pl.'s Resp. at 18-19. Dr. Cronkhite contends that shareholders have relatively little decision-making authority aside from voting on the election of new Board members,[9] being eligible to be a Board member, and having access to financial

---

    [9] Dr. Cronkhite also asserts that he was denied the opportunity to vote for the Board of
(continued...)

documents.  He also emphasizes that he has not served on the Board of Directors of Unity – rather, only for its predecessor corporations, from 1982 to 1996.

In our view, the fact that Dr. Bishop, as President and CEO of Unity, may have exercised significant influence over the organization does not negate the fact that Dr. Cronkhite influenced Unity as well.  See Wheeler v. Hurdman, 825 F.2d 257, 273-74 (10th Cir. 1987).  This Clackamas factor does not require that all of those with influence had *equal* potential to control the organization; rather, we are to consider "whether, and if so, to what extent" an individual wielded influence.  Clearly, Dr. Cronkhite exercised great control over the organization as a member of its Board from 1982 through 1996.  More recently, his status as a major shareholder, with ownership of twelve percent of Unity's stock, granted him a significant amount of influence as well.  Compare Schmidt, 322 F.3d at 462, 467 (holding that Schmidt was not an employee in part because "[a]s a shareholder, he possesse[d] an equal vote in all matters put to shareholder vote").

Moreover, the fact that Dr. Cronkhite was not ultimately successful in some attempts to exert influence over Unity – specifically, his unsuccessful bid for a Board position in 2003 – does not demonstrate that he lacked influence.  As the Court stated in Schmidt, "the mere fact that . . . [an individual's] preferences . . . have not secured the majority opinion of his fellow shareholders does not alter the fact that with each vote he has exercised this right to control."  322 F.3d at 467.  Dr. Cronkhite's power to vote

---

[9](...continued)
Directors at times, including the vote in which the Board was initially constructed.  Pl.'s Resp. at 20.  However, no citations to the record have been provided in support of this assertion.

twelve percent of Unity's outstanding stock shares, as well as his history of playing

influential roles within the organization and its predecessors, support the conclusion that

he was not Unity's employee.

> 5.      Whether the Parties Intended that Dr. Cronkhite Be an Employee, as
>         Expressed in Written Agreements or Contracts

As previously described, the contract between Dr. Cronkhite and Unity was

entitled the "Physician Employment Agreement."  The document stated that "Unity and

Physician desire to enter into an employment relationship whereby Physician will be

employed by Unity," and declared that "Unity hereby employs Physician and Physician

hereby accepts employment to practice medicine as an emergency and/or urgent care

physician, on a full time basis."  Def.'s Ex. P.  Dr. Cronkhite states that he believed that

he was a Unity employee.  Pl.'s Resp. at 21.  Further, the stock agreements for Unity and

its predecessors from 1983, 1987, 1988, and 1992 contain a statement that "[e]ach of the

Shareholders is deemed to be in the employ of the Corporation."  Id.  Therefore, Dr.

Cronkhite asserts that the parties clearly intended that he would be a Unity employee.

Based on the evidence adduced by Dr. Cronkhite (and not controverted by Unity)

about these written documents, it is clear that this factor weighs in favor of Dr. Cronkhite.

However, as previously stated, the Clackamas analysis demands that we consider all

relevant circumstances surrounding the relationship between the parties.  Therefore,

though this factor weighs in favor of a determination that Dr. Cronkhite was Unity's

employee, it is not dispositive.  See Clackamas, 538 U.S. at 450 ("Nor should the mere

existence of a document styled 'employment agreement' lead inexorably to the conclusion that either party is an employee."); <u>Schmidt</u>, 322 F.3d at 467 (holding that Dr. Schmidt was not an employee even though he was party to an "employment agreement, which repeatedly refers to him as an employee").

> 6.    Whether Dr. Cronkhite Shared in the Profits, Losses, and Liabilities of Unity

Finally, we consider whether Dr. Cronkhite shared in Unity's profits, losses, and liabilities.  As described, Dr. Cronkhite shared in Unity's profits through his receipt of discretionary bonuses as a Unity shareholder – he received such bonuses eighteen times between 1980 and 2003, and the bonuses often exceeded $100,000 (topping out at $334,750 in 2000).[10]  He also shared in Unity's liabilities through the two personal guaranties he signed on Unity's debts, which totaled $3.2 million.

Therefore, this factor also weighs heavily in favor of Unity's assertion that Dr. Cronkhite was not its employee.  Dr. Cronkhite shared in millions of dollars of the company's profits, and subjected himself to personal liability for millions of dollars of its debts.  "[S]haring in the profits, losses, and liabilities of an enterprise is an indicum of ownership, and an owner can qualify as an employer." <u>Castaways</u>, 453 F.3d at 985; <u>see</u>

---

[10] Dr. Cronkhite attempts to discount this fact by stating that Unity's Board of Directors is solely responsible for the distribution of bonuses.  Pl.'s Resp. at 22.  We fail to see the relevance of this argument, noting that the Board's discretion does not change the fact that Dr. Cronkhite did in fact share in the company's profits nearly every year since 1980.  (Further, Dr. Cronkhite served on the Board of Unity's predecessor companies for fourteen years, during which time he was partially responsible for approving bonus distributions.)

also Solon, 398 F.3d at 631, 633 (relying in part on the fact that Solon signed a revolving letter of credit for his firm and shared in the firm's profits in determining that he was not the firm's employee).


C.      *Conclusion*

Therefore, having considered each factor of the Clackamas analysis, we hold that Dr. Cronkhite was not an employee of Unity Physician Group, and as such may not invoke against Unity the protections of the ADA and ADEA.  Therefore, Unity's Motion for Summary Judgment is GRANTED, and final judgment shall be entered accordingly. IT IS SO ORDERED.


Date: _____03/30/2007_____

_Sarah Evans Barker_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Carolyn Ann Clay
HASKIN LAUTER LARUE & GIBBONS
cclay@hlllaw.com

Kenneth E. Lauter
HASKIN LAUTER LARUE & GIBBONS
klauter@hlllaw.com

Stephen W. Lyman
HALL RENDER KILLIAN HEATH & LYMAN
slyman@hallrender.com

Dana Eugene Stutzman
HALL RENDER KILLIAN HEATH & LYMAN
dstutzman@hallrender.com

23